T.C. Memo. 1998-67

UNITED STATES TAX COURT

CHRISTOPHER A. BOYKO AND ROBERTA A. BOYKO, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 15347-96.                    Filed February 18, 1998.

Christopher A. Boyko, pro se.

<u>Christopher A. Fisher</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, <u>Judge</u>:  Respondent, by means of a statutory notice
of deficiency, determined an income tax deficiency of $27,061, a
section 6651(a)(1)[1] addition to tax of $953, and a section

_____

[1]Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for the year under
consideration, and all Rule references are to this Court's Rules
of Practice and Procedure.

6662(a) penalty of $2,661, for petitioners' 1991 taxable year. Respondent has conceded that petitioners are not liable for the section 6651(a)(1) addition to tax.  After further concessions, the following issues remain for our consideration:  (1) Whether petitioners are entitled to an ordinary or a capital loss deduction for funds expended in a business venture; (2) whether petitioners are liable for an accuracy-related penalty under section 6662 in the amount of $2,661.

## FINDINGS OF FACT[2]

Petitioners, Christopher A. Boyko and Roberta A. Boyko, are husband and wife and resided in Parma, Ohio, at the time their petition was filed in this case.  Petitioners filed a joint return for the 1991 taxable year.  Roberta Boyko is a party to this proceeding solely because she signed the joint return for 1991; consequently, Christopher Boyko is referred to herein as petitioner.

Petitioner is a lawyer and has practiced law in Ohio since 1979.  Until June 1987, petitioner practiced in the law practice of his father, Andrew Boyko.  Petitioner practiced in a variety of areas, including personal injury, probate, and business law. In June 1987, petitioner acquired his father's law practice, and was subsequently elected to the office of Law Director for the

_____

[2]The stipulation of facts and the attached exhibits are incorporated by this reference.

City of Parma, Ohio.  As Law Director, he was the chief attorney for the City of Parma, responsible for the supervision of the city's civil and criminal legal functions, advising elected officials and drafting proposed legislation for city council.

Sometime during 1987, petitioner was introduced to Raymond Kelley (Mr. Kelley) by Leonard Bergenstein (Mr. Bergenstein), known to petitioner as knowledgeable in the field of computers and software.  Messrs. Kelley and Bergenstein represented to petitioner that Mr. Kelley was developing computer software which could someday be of significant commercial value.  This software purportedly would increase computer speed and storage capacity, and would also be virus-proof.  Petitioner, who was not in the business of lending money, invested in Mr. Kelley's computer software project.

From March 1988 through August 1991, petitioner advanced over $100,000 to Mr. Kelley's program.  The format for petitioner's advances varied.  He wrote 65 checks totaling $65,066 made payable to Mr. Kelley, between August 18, 1988, and June 14, 1990.  Between August 18, 1988, and June 21, 1989, Mr. Kelley executed 25 notes in favor of petitioner evidencing 25 of the 65 checks.  The notes called for 10-percent interest, but no principal or interest was paid on the notes.

On March 21, 1988, petitioner's law firm, Boyko & Boyko, entered into a 60-month lease agreement with Bison Leasing Co.

for the lease from Bison Leasing Co. of certain computer hardware. This lease was eventually assigned to the Fleet Credit Corp./Denrich Leasing Group. The computer hardware was leased for the sole benefit of and use by Mr. Kelley. From March 21, 1988, through January 31, 1991, petitioner paid $9,565 under this lease.

On September 14, 1989, petitioner executed a lease with Active Leasing, Inc., for a 1990 Plymouth Acclaim automobile for Mr. Kelley's use. This lease was eventually assigned to Bank One of Akron. During Mr. Kelley's use of the vehicle, petitioner paid $7,787 in connection with this lease.

On April 5, 1990, petitioner entered into a 3-year lease agreement with James-McGuire Associates for the lease of certain computer hardware. This lease was eventually assigned to Orix Credit Alliance. This computer hardware was also leased for Mr. Kelley's use. From April 5, 1990, through January 31, 1991, petitioner paid $13,873 under this lease.

The initial entity formed for the development and production of the computer program was Transnational Information Controls, Inc. (TIC). TIC was incorporated under the laws of the State of Ohio on January 26, 1989. Petitioner owned 50 of the 764 outstanding shares of TIC. Petitioner provided legal services to TIC in exchange for his TIC stock.

Petitioner was vice president and general counsel of TIC. In the offering circular describing the corporation and the new computer program, petitioner's law firm, Boyko & Boyko, was listed as general counsel for the corporation. The circular provided that Boyko & Boyko would be on a yearly retainer for the corporation and paid $50,000 per year for services. Petitioner was not paid for any legal services provided to TIC, apart from his receipt of stock in TIC. Petitioner also spent time trying to market the computer software.

TIC was eventually replaced by Multilogic Corp. (Multilogic). Multilogic was incorporated under the laws of the State of Ohio on February 11, 1991. Multilogic's sole asset was the rights to the computer software being developed by Mr. Kelley. Petitioner's TIC shares were replaced with an equal percentage of Multilogic Shares. In addition, Multilogic executed a demand note in favor of petitioner in the amount of $74,749 for payments made by petitioner to Mr. Kelley.

Sometime during late 1990, petitioner and Walter Bubna (Mr. Bubna), another shareholder of TIC, became concerned about their advances to Mr. Kelley's computer program. Petitioner, Mr. Bubna, and Mr. Bergenstein decided to hire Mickey Miller (Mr. Miller) to investigate Mr. Kelley and the software being developed by him. Based on Mr. Miller's report, petitioner

concluded that the computer program was worthless. Petitioner paid Mr. Miller $17,715 for his services.

Following the investigation, petitioner decided to obtain a full release from the computer leases. On July 25, 1991, petitioner paid $26,750 to Orix Credit Alliance to obtain a full release from all further obligations owed by him under the computer lease agreement assigned to Orix. On July 30, 1991, petitioner paid $3,800 to Fleet Credit Corp. to be released from all further obligations owed by him under the computer lease agreement with Fleet. In April 1991, petitioner regained possession of the automobile that he had leased for the benefit and use of Mr. Kelley, and paid Americana Leasing (successor to Active Leasing) $10,155 for the purchase of the automobile.

On November 5, 1992, petitioner obtained a judgment against Multilogic for enforcement of the demand note. Petitioner has not received any payment on the judgment. No criminal charges were ever filed against Mr. Kelley.

On his 1991 return petitioner claimed a section 1244 stock loss in the amount of $83,989 for funds invested in TIC/Multilogic, a $9,899 section 162 expense for amounts paid under the computer leases, and a $17,715 legal and professional fees expense for the payments to Mr. Miller. Respondent determined that the losses were not allowable.

OPINION

The primary issue in this case is whether petitioner is entitled to an ordinary loss deduction versus a capital loss deduction for the advances lost in the business venture with Mr. Kelley and TIC/Multilogic.  Respondent challenges only the character of the losses.  Petitioner argues that the losses are ordinary under several alternative theories.  Respondent asserts that the losses are capital and, therefore, subject to the capital loss limitation rules of section 1211.

I.  Section 1244--Losses on Small Business Stock

Petitioner's first argument is that he is entitled to a section 1244 stock loss in the amount of $83,989[3] as originally claimed on his return.  Respondent disallowed petitioner's section 1244 worthless stock loss, determining that the stock issued did not satisfy all of the requirements for qualification of section 1244 stock.  Section 1244 provides that any loss resulting from the sale of section 1244 stock shall be treated as an ordinary loss.  Sec. 1244(a).  To qualify as section 1244 stock, the stock must be common stock issued by a domestic "small business corporation", as defined in section 1244(c)(3), and the

---

[3]Petitioner offered no evidence indicating how this figure was arrived at.  We assume that the $83,989 is composed of the $65,066 in checks and a portion of the lease payments made by petitioner.  Respondent does not challenge the amount of the deduction.

consideration paid by the shareholder on the issuance of the stock must be money or other property.  Sec. 1244(c)(1). Respondent does not challenge whether TIC was a "small business corporation" for purposes of section 1244, but instead focuses on the consideration petitioner provided for the TIC shares.

Petitioner stipulates that he did not contribute money or other property to TIC in exchange for his shares of TIC stock. Therefore, petitioner is not entitled to section 1244 treatment for his original basis in the TIC stock.  Petitioner did, however, transfer thousands of dollars to Mr. Kelley, the President of TIC, for the benefit of TIC.  Although petitioner did not receive any additional shares for his transfers to Mr. Kelley, he argues that these transfers could be considered capital contributions which would increase his basis in his TIC/Multilogic stock.  Petitioner's section 1244 stock loss claimed on his return apparently included these transfers.

Section 1244 provides that the increase in basis resulting from a contribution to capital "shall be treated as allocable to stock which is not section 1244 stock."  Sec. 1244(d)(1)(B). This statutory rule applies to any increase in basis, however effected.  <u>Bledsoe v. Commissioner</u>, T.C. Memo. 1995-521. Accordingly, petitioner is not entitled to section 1244 loss

treatment for any portion of his basis in TIC/Multilogic stock that may have been increased by capital contributions.

## II.  Section 166--Bad Debts

Petitioner next argues, in the alternative, that the expenses originally deducted as a section 1244 worthless stock loss are deductible as a business bad debt under section 166.  In addition, petitioner argues that the $30,550 paid for the release of the two computer leases, which was originally deducted as a long-term capital loss on petitioner's 1991 return, should also be deductible as a business bad debt under section 166.[4] Respondent contends that petitioner is not entitled to business bad debt treatment because:  (1) The payments to or for the benefit of Mr. Kelley do not represent a bona fide debt; and (2) assuming that the payments did result in a bona fide debt, the debt owed to petitioner was a nonbusiness bad debt.  We agree with respondent's first argument and do not consider the question of whether the payments to or for the benefit of Mr. Kelley represent a business versus a nonbusiness bad debt.

Generally, taxpayers may deduct the value of bona fide debts owed to them that become worthless during the year.  Sec. 166(a).

---

[4]Respondent contends that petitioner's claim with respect to the release of the computer leases should be denied as untimely and not properly raised.  Because we find no merit to petitioner's position it is unnecessary to address the merits of respondent's argument.

Bona fide debts generally arise from valid debtor-creditor relationships reflecting enforceable and unconditional obligations to repay fixed sums of money.  Sec. 1.166-1(c), Income Tax Regs.  For purposes of section 166, contributions to capital do not constitute bona fide debts.  <u>Kean v. Commissioner</u>, 91 T.C. 575, 594 (1988).

The question of whether any of the payments or transfers of funds to or on behalf of closely held corporations constitute debt or equity must be considered on the basis of all the relevant facts and circumstances.  <u>Dixie Dairies Corp. v. Commissioner</u>, 74 T.C. 476, 493 (1980).  Taxpayers generally bear the burden of proving that the transfers constituted loans and not equity investments.  Rule 142(a).

Courts look to the following nonexclusive factors to evaluate the nature of transfers of funds to closely held corporations:  (1) The names given to the documents evidencing the purported loans; (2) the presence or absence of fixed maturity dates with regard to the purported loans; (3) the likely source of any repayments; (4) whether the taxpayers could or would enforce repayment of the transfers; (5) whether the taxpayers participated in the management of the corporations as a result of the transfers; (6) whether the taxpayers subordinated their purported loans to the loans of the corporations's

creditors; (7) the intent of the taxpayers and the corporations; (8) whether the taxpayers who are claiming creditor status were also shareholders of the corporations; (9) the capitalization of the corporations; (10) the ability of the corporations to obtain financing from outside sources at the time of the transfers; (11) how the funds transferred were used by the corporations; (12) the failure of the corporations to repay; and (13) the risk involved in making the transfers. Dixie Dairies Corp. v. Commissioner, supra at 493.

These factors serve only as aids in evaluating whether transfers of funds to closely held corporations should be regarded as capital contributions or as bona fide loans. Boatner v. Commissioner, T.C. Memo. 1997-379. No single factor is controlling. Dixie Dairies Corp. v. Commissioner, supra at 493. Utilizing some of the factors noted above, we come to the conclusion that no debtor-creditor relationship was created.

First, we observe that although some of petitioner's, advances to Mr. Kelley, or payments made on his behalf, were evidenced by notes, no payments of interest or principal were ever made on any of the notes. In addition, petitioner continued making these alleged "loans" despite the fact that both Mr. Kelley and TIC/Multilogic repeatedly failed to repay the notes when they became due. Petitioner's failure to demand repayment

and continued lending of additional funds tends to refute the existence of a valid debtor-creditor relationship. Boatner v. Commissioner, supra.

Further, petitioner made these substantial advances without obtaining any collateral or third-party guarantees. The repayment of the notes was completely dependent on whether or not Mr. Kelley would be able to develop and market the computer software. This factor indicates that the advances were equity and not debt. Stinnett's Pontiac Serv., Inc. v. Commissioner, 730 F.2d 634, 639 (11th Cir. 1984), affg. T.C. Memo. 1982-314. Based on the record as a whole, we conclude that there was no expectation of repayment, and that the advances did not constitute bona fide loans.

III. Section 165--Theft Losses

Petitioner next argues, in the alternative, that the expenses originally deducted as a section 1244 stock loss and the $30,550 paid for the release of the computer leases are deductible as a theft loss under section 165. Respondent disagrees, contending that petitioners have failed to show that Mr. Kelley committed any of the acts that would constitute the crime of theft by deception under Ohio law.

Section 165 provides a deduction for any loss arising from theft sustained in the year the taxpayer discovers the loss. A

theft loss within the meaning of section 165 requires a "theft" under applicable State law. See Viehweg v. Commissioner, 90 T.C. 1248, 1253 (1988). Under Ohio law, to be guilty of theft by deception, it must be shown that the accused obtained money or property of the alleged victim by knowingly deceiving him by a false or misleading representation, by withholding information, by preventing the alleged victim from acquiring information, or by any other conduct, act, or omission which created, confirmed, or perpetuated a false impression as to law, value, state of mind or other objective or subjective fact. Ohio Rev. Code Ann. sec. 2913.01(A) (Anderson 1996). Petitioner has the burden of proving theft under Ohio law. Rule 142(a).

Petitioner has failed to prove under Ohio law that a theft has occurred. There is no evidence establishing that any statements or representations made by Mr. Kelley that petitioner may have relied on were false; there is no evidence that any false statements were made with the intent of criminally appropriating petitioner's money; and there is no evidence establishing that petitioner's loss was related to any false representations. Viehweg v. Commissioner, supra at 1254. Petitioner testified that Mr. Kelley had pirated some portion of the software and had deceived petitioner as to his rights to the software being developed. Petitioner offered no evidence, other

than his own testimony, in support of these allegations. Petitioner's own assertions are simply insufficient to establish that he is entitled to claim a theft loss for the amounts paid to Mr. Kelley.

Petitioner also asserts that because the computer program is now worthless, Mr. Kelley has committed theft by deception. We disagree. A loss resulting from investments in questionable enterprises does not, per se, amount to theft. See Hartwick v. Commissioner, T.C. Memo. 1988-424; Ennis v. Commissioner, T.C. Memo. 1986-178. There is no persuasive evidence of any misrepresentations by Mr. Kelley in the record. In essence, the record here reflects that petitioner invested in an idea of Mr. Kelley's that never materialized. Accordingly, petitioner is not entitled to a theft loss deduction for amounts paid to Mr. Kelley.

IV. Section 162--Trade or Business Expenses

Petitioner's final argument is that the $30,550 paid for the release of the computer leases, the $9,899 paid under the computer leases, and the $17,715 paid to Mr. Miller for investigating the computer program are deductible as an ordinary and necessary business expense under section 162. Petitioner asserts that the payments were ordinary and necessary business expense under two alternative theories. First, petitioner

asserts that the payments are deductible as an ordinary and necessary business expense in petitioner's separate business of developing computer software. Second, petitioner contends that the payments are deductible as an ordinary and necessary expense of petitioner's law practice because they were incurred to protect petitioner's professional reputation as an attorney. Respondent contends that the payments were not ordinary and necessary expense of petitioner's law practice and that petitioner's only trade or business was the practice of law. Respondent argues that the payments are allowable as a capital loss deduction to petitioner, subject to the capital loss deduction limitation rules of section 1211. We address each argument separately.

Section 162(a) provides for a deduction for "ordinary and necessary" expenses paid or incurred during the taxable year in carrying on a trade or business. Sanford v. Commissioner, 50 T.C. 823, 826 (1968), affd. per curiam 412 F.2d 201 (2d Cir. 1969). An ordinary and necessary expense is one that is appropriate and helpful to the taxpayer's business and that results from an activity which is a common and accepted practice. Boser v. Commissioner, 77 T.C. 1124, 1132 (1981), affd. by order (9th Cir., Dec. 22, 1983). Deductions are a matter of legislative grace, and petitioner bears the burden of proving

that he is entitled to the deductions claimed.  Rule 142(a);

INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).

Petitioner's first argument is that the above listed amounts
are deductible as an ordinary and necessary business of
petitioner's separate business of developing computer software.
Although petitioner did spend time trying to develop a market for
the computer software, petitioner's activity with respect to the
computer software did not rise to the level of a separate trade
or business.  With the exception of petitioner's involvement with
TIC/Multilogic, petitioner has never engaged in the trade or
business of investing in, organizing, or financing business
enterprises.  A shareholder of a corporation is not engaged in
the trade or business in which the corporation is engaged unless
the shareholder engages in such trade or business apart from his
affiliation with the corporation as an investor.  Smith v.
Commissioner, T.C. Memo. 1994-640; Jerich v. Commissioner, T.C.
Memo. 1992-136.

Furthermore, the computer leases were expenses of
TIC/Multilogic, not petitioner.  Likewise, since the payment to
Mr. Miller was incurred investigating the business of the
corporation and not petitioner's legal business, that amount is
also a corporate expense.  Schrott v. Commissioner, T.C. Memo.
1989-346.  The rule is well established that a shareholder is not

entitled to a deduction from his personal income for his payment of the expenses of his corporation; such amounts constitute either a loan or a contribution to the capital of the corporation and are deductible, if at all, by the corporation. Deputy v. du Pont, 308 U.S. 488, 494 (1940); Rink v. Commissioner, 51 T.C. 746, 751 (1969).

Petitioner argues, in the alternative, that the payments are deductible as an ordinary and necessary expense of petitioner's law practice because they were incurred to protect petitioner's professional reputation as an attorney. Petitioner cites two cases in support of his position.

Petitioner cites Jenkins v. Commissioner, T.C. Memo. 1983-667, which involved a country music singer who repaid certain corporate debts to investors of a restaurant business that he had promoted. The Court allowed the taxpayer to deduct the payments as a section 162 expense of his business as a country singer, even though the taxpayer had no obligation to repay the loans. The Court reasoned that the payments were necessary to protect the taxpayer's personal business reputation, noting that many of the investors were connected with the country music industry. Similarly, in Lutz v. Commissioner, 282 F.2d 614 (5th Cir. 1960), a shareholder of a corporation was allowed to deduct expenses that he paid on behalf of three corporations, even though he had no legal obligation to do so. The Court of Appeals held that the failure to make these payments might have jeopardized the taxpayer's licenses in his principal business as a produce buyer

and shipper.  Both of these cases represent exceptions to the general rule that payments made by a shareholder on behalf of a corporation are capital contributions by the shareholder, and not deductible expenses.  Deputy v. du Pont, supra.

Petitioner fails to qualify for the exception discussed in Jenkins and Lutz for two reasons.  First, unlike Jenkins and Lutz, petitioner's obligation to make these payments arose primarily because of his desire to protect his investment in TIC/Multilogic, not to protect his business reputation as an attorney.  In addition, petitioner has presented no evidence that his business reputation as an attorney would have been adversely affected by his failure to hire Mr. Miller to investigate the computer program, or by his failure to obtain releases from the various leases.  Accordingly, petitioner is not entitled to deduct these payments as a section 162 expense.

In conclusion, petitioner is not entitled to claim as an ordinary loss the advances lost in the business venture with Mr. Kelley and TIC/Multilogic.

## V.  Section 6662--Imposition of Accuracy-Related Penalty

Respondent determined that petitioner's underpayment of tax was due to negligence or disregard of rules or regulations under section 6662.  Section 6662(a) and (b)(1) imposes an accuracy-related penalty equal to 20 percent of the portion of the underpayment that is attributable to negligence or disregard of rules or regulations.

Negligence has been defined as a "lack of due care or a failure to do what a reasonable person would do under the circumstances."  Leuhsler v. Commissioner, 963 F.2d 907, 910 (6th Cir. 1992), affg. T.C. Memo. 1991-179.  Respondent's determination of negligence is presumed to be correct, and the taxpayer has the burden of proving that the determination is erroneous.  Rule 142(a).  Therefore, petitioner must prove that he was not negligent; i.e., that he made a reasonable attempt to comply with the provisions of the Internal Revenue Code, and that he was not careless, reckless, or in intentional disregard of rules or regulations.  Sec. 6662(b) and (c).

We sustain respondent's determination.  In determining whether petitioner was negligent in the preparation of his return, we take into account petitioner's years of legal experience.  Glenn v. Commissioner, T.C. Memo. 1995-399, affd. without published opinion 103 F.3d 129 (6th Cir. 1996).  Beyond his own assertions, petitioner has offered no evidence to showing that respondent's negligence determination was in error.  Accordingly, petitioners are liable for the section 6662(a) penalty.

To reflect the foregoing,

Decision will be entered

under Rule 155.